## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| **FAITH ACTION MINISTRY ALLIANCE, INC.**, doing business as **GRANT PARK CHRISTIAN ACADEMY**,<br><br>    Plaintiff,<br><br>  v.<br><br>**NIKKI FRIED**, in her official capacity as Florida Commissioner of Agriculture and Consumer Services;<br>**JOSEPH R. BIDEN, JR.**, in his official capacity as President of the United States;<br>**THOMAS J. VILSACK**, in his official capacity as Secretary of the U.S. Department of Agriculture;<br>**LISA CHURCH**, in her official capacity as Chief, Bureau of Child Nutrition Programs, Division of Food, Nutrition and Wellness, Florida Department of Agriculture and Consumer Services;<br>**NEDRA HARRINGTON**, in her official capacity as Senior Management Analyst II, Division of Food, Nutrition and Wellness, Florida Department of Agriculture and Consumer Services;<br>**U.S. DEPARTMENT OF AGRICULTURE**, a federal agency; and **UNITED STATES OF AMERICA**,<br><br>    Defendants. | Case No. _____<br><br><br>**VERIFIED COMPLAINT**<br><br>Jury Trial Demanded |

1

## VERIFIED COMPLAINT

Plaintiff Faith Action Ministry Alliance, Inc., doing business as Grant Park Christian Academy for its verified complaint, states:

## INTRODUCTION

1.      Florida Agriculture Commissioner Nikki Fried and the Biden Administration are punishing low-income children and threatening to take away their school lunches—simply because they attend Christian schools.

2.      Grant Park Christian Academy serves children from a low-income, minority community in Tampa, Florida. Students at Grant Park Christian Academy receive financial assistance from scholarship organizations, and they receive free meals from the school's lunch program.

3.      For many children, the food they get at Grant Park Christian Academy is the best meal they eat all day—and sometimes, it's the only meal.

4.      Grant Park Christian Academy treats every student with dignity and respect. The school would never turn away a hungry child.

5.      But Agriculture Commissioner Nikki Fried and the Biden Administration are threatening Grant Park Christian Academy's ability to feed hungry children.

6.      Grant Park Christian Academy receives funding to pay for school lunches from the U.S. Department of Agriculture through the National School Lunch Program administered by Commissioner Fried.

2

7.     Under Title IX of the Education Amendments of 1972, participating schools agree not to discriminate based on sex. That's no problem for Grant Park Christian Academy—the school never excludes or discriminates against any student because of sex. But the Biden Administration has redefined the word "sex" in Title IX to address sexual orientation and gender identity. Now, based on this redefinition, Commissioner Fried is poised to block Grant Park Christian Academy's funding for school lunches this year.

8.     This new school lunch mandate applies to all school activities, including restrooms, dress codes, hiring, admissions, curricula, athletics, and daily conversations. It forbids sex-specific restrooms or dress codes. And it requires the use of "preferred" pronouns contrary to a student's sex.

9.     If Grant Park Christian Academy does not comply with the new school lunch mandate, it will lose lunch funding for its children.

10.    But if Grant Park Christian Academy complies with the new school lunch mandate, it will suffer harms to its educational mission, free speech, and religious exercise. It will no longer be able to maintain sex-separated restrooms for boys and girls based on their biological differences. It will no longer be able to maintain sex-specific dress code and uniform policies, in which, for example, only female students are permitted to wear skorts. It will no longer be able to draw its workforce from among those who

share and live out its religious convictions. It will no longer be able to refrain from using pronouns that do not correspond to biological sex.

11.     Grant Park Christian Academy pointed out to state officials that this broad new school lunch mandate is not based on an accurate understanding of the law and that Title IX provides a religious exemption, regardless. But Commissioner Fried's office responded by telling Grant Park Christian Academy that a participating "school must comply with all federal program regulations."

12.     Commissioner Fried's office gave the school one option when the school objected to violating its religious beliefs—"your school is not required to participate in the National School Lunch Program."[1]

13.     In short, the Biden Administration and Commissioner Fried's push to redefine sex in federal law has now reached the point where they will deny school lunches to underprivileged students, just because their school will not violate their religious beliefs.

14.     Schoolchildren should not have to pay the price for federal and state officials' misplaced and unlawful agenda.

15.     As other courts have held, government officials act unlawfully when they seek to rewrite Title IX through an arbitrary rule without public

---

[1] Exhibit A, Email from Lisa Church, Florida Department of Agriculture and Consumer Services, to Alfred Johnson, Grant Park Christian Academy (July 18, 2022).

participation and oversight—and with no thought to the chaos and confusion that it would sow for religious schools committed to feeding hungry schoolchildren.

16.     The school lunch mandate also conflicts with Title IX's religious exemption. This exemption should apply by operation of statute, but USDA interprets Title IX to require religious schools to submit exemption requests for USDA approval. These requests do not guarantee that schools have been, or even will be, exempt—but submitting requests do subject schools to a name-and-shame harassment campaign from activists.

17.     Grant Park Christian Academy's school year starts August 10, and, because Grant Park Christian Academy has not abandoned its religious beliefs, Commissioner Fried is poised to block its school lunch funding at any time. The school thus will suffer irreparable harm if this Court does not enjoin these officials from taking away children's school lunch money.

## JURISDICTION AND VENUE

18.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this civil rights action raises federal questions under the Civil Rights Act of 1871, 42 U.S.C. § 1983; the Administrative Procedure Act, 5 U.S.C. §§ 553, 701–706 (APA); the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq. (RFRA); and the United States Constitution, particularly the First and Fourteenth Amendments.

19.     This Court also has jurisdiction under 28 U.S.C. § 1346(a) because this is a civil action against the United States.

20.     This Court has jurisdiction under 28 U.S.C. § 1361 to compel an officer of the United States or any federal agency to perform his or her duty.

21.     This Court has jurisdiction to review Defendants' unlawful actions and enter appropriate relief under the Administrative Procedure Act's cause of action, 5 U.S.C. §§ 553, 701–706.

22.     This court has jurisdiction to issue equitable relief to enjoin ultra vires or unconstitutional agency action through an equitable cause of action. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–91 (1949).

23.     This court has jurisdiction to issue equitable relief to enjoin unconstitutional state officials' action under the Civil Rights Act of 1871's cause of action, 42 U.S.C. § 1983.

24.     This case seeks declaratory, injunctive, and other appropriate relief under 5 U.S.C. § 705 & 706, 28 U.S.C. § 1343, 28 U.S.C. §§ 2201–2202, 42 U.S.C. § 1983, 42 U.S.C. § 2000bb-1, Federal Rule of Civil Procedure 57, and the Court's inherent equitable powers.

25.     This Court may award costs and attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412; the Religious Freedom Restoration Act, 42 U.S.C. 1988(b); and 42 U.S.C. § 1988(b).

26.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district, and a substantial part of property that is the subject of the action is situated here, because this district and this division is where Plaintiff is situated and is regulated by Defendants' actions. Defendants are United States agencies or officers sued in their official capacities and state officers sued in their official capacities. A substantial part of the events or omissions giving rise to the Complaint occurred within this district.

## PLAINTIFF

27.     Plaintiff Faith Action Ministry Alliance, Inc., doing business as Grant Park Christian Academy, is a 501(c)(3) nonprofit corporation organized under the laws of the State of Florida. Its address is 5107 East 32nd Avenue, Tampa, Florida 33619.

28.     Faith Action Ministry Alliance (FAMA) was founded in June 2014 with the express purpose of advancing communities through a practical model of evangelism that engages neighborhoods to affect enduring, positive social and spiritual change.

29.     Its mission is to lift up low-income neighborhoods by addressing critical needs within the community. FAMA helps grow stronger neighborhoods through the power of religious networking, business development, and strategic community connections.

7

30.     FAMA currently focuses on positively impacting the lives of children and families in the Grant Park neighborhood of East Tampa, a low-income minority community.

31.     As part of its mission, FAMA operates Grant Park Christian Academy, a nondenominational Christian private school, to educate and feed needy children from the local Grant Park neighborhood.

32.     It seeks to be able to continue to follow its religious beliefs in all school operations, including restrooms, dress codes, hiring, admissions, curricula, activities, and daily conversations.

## DEFENDANTS

33.     Grant Park Christian Academy brings this suit against the federal and state officials responsible for running the school meal programs.

### A.     State Defendants

34.     Defendant Nikki Fried is named in her official capacity as Florida Commissioner of Agriculture and Consumer Services. She is responsible for the overall operations of Florida Department of Agriculture and Consumer Services (FDACS), including its implementation of the federal school meal programs. Fla. Const. art. iv, § 4. Her address is Plaza Level 10, The Capitol, 400 South Monroe Street, Tallahassee, Florida 32399-0800.

35.     Commissioner Fried's duties include authorizing, executing, enforcing, and implementing FDACS policies. Her duties also include

8

overseeing FDACS operation and management. She has the final policymaking authority for the enactment, amendment, enforcement, execution, and implementation of FDACS policies and their application. She possesses the authority to change and enforce the policies.

36.  Commissioner Fried has directed her office to enforce the Biden Administration's unlawful school lunch mandate. FDACS personnel are applying this school lunch mandate. She has not instructed FDACS personnel to refrain from applying this school lunch mandate to religious schools.

37.  As commissioner, Defendant Fried has the authority to review, approve, or reject the decisions of other officials about the policies challenged here. Commissioner Fried not only authorized, approved, or implemented the policies used to restrict Grant Park Christian Academy's freedoms, but she also failed to stop any FDACS officials from applying those policies to it.

38.  Defendant Lisa Church is named in her official capacity as Chief, Bureau of Child Nutrition Programs, Division of Food, Nutrition and Wellness, Florida Department of Agriculture and Consumer Services. She is responsible for administering school meal programs, and she communicated the school lunch mandate to Grant Park Christian Academy. Her address is 407 South Calhoun Street (H2), Tallahassee, Florida 32399.

39.  Defendant Nedra Harrington is named in her official capacity as Senior Management Analyst II, Division of Food, Nutrition and Wellness,

9

Florida Department of Agriculture and Consumer Services. She administers school meal programs, and she communicated the school lunch mandate to Grant Park Christian Academy. Her address is The Holland Building, 600 South Calhoun Street, Tallahassee, Florida 32399.

40.     Collectively these three Florida state defendants are referred to as "the state government" or "the state officials."

## B.     Federal Defendants

41.     Defendant Joseph R. Biden, Jr. is named in his official capacity as President of the United States. His address is The White House, 1600 Pennsylvania Avenue, N.W., Washington, DC 20500. President Biden issued Executive Orders on which the federal defendants relied.

42.     Defendant Thomas J. Vilsack is named in his official capacity as Secretary of the United States Department of Agriculture (USDA). His address is 1400 Independence Avenue, S.W., Washington, DC 20250. He is, in this capacity, responsible for the administration and implementation of policy within USDA, 7 U.S.C. § 2201–22, 7 C.F.R. § 2.1 et seq., including investigating complaints; enforcing Title IX; abiding by religious exemptions; and administering the school meal programs.

43.     Defendant United States Department of Agriculture (USDA) is a federal cabinet agency within the executive branch of the U.S. government under 7 U.S.C. § 2201–22, 5 U.S.C. § 551 and 701(b)(1). Its address is 1400

Independence Avenue, S.W., Washington, DC 20250. USDA is "an executive department, under the supervision and control of a Secretary of Agriculture." 7 U.S.C. § 2202. No Senate-confirmed official leads any of the subcomponents of USDA that enforce the meal programs or Title IX.

44.    Defendant United States of America is sued under the Administrative Procedure Act. 5 U.S.C. § 703 ("[T]he action for judicial review may be brought against the United States."). The U.S. executive branch has other agencies concurrently responsible for the administration and enforcement of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, such as the Departments of Education and Justice.

45.    Collectively, these four federal defendants are referred to as "the federal government" or "the federal officials."

46.    Each federal defendant is directed by President Biden's Executive Orders to adopt as binding policy and to employ in agency actions the definition of "sex" outlined in the Executive Orders in their administration of federal regulatory programs, conduct of agency rulemakings, and other agency actions.

47.    The federal officials are subject to the APA, as are the state officials, who are in concert with USDA. 5 U.S.C. § 701(b); 5 U.S.C. § 551(1).

## FACTUAL ALLEGATIONS

**I.     Grant Park Christian Academy**

      **A.     Grant Park Christian Academy's religious mission**

48.     Founded in 2015, Grant Park Christian Academy serves children from pre-kindergarten through eighth grade.

49.     Grant Park Christian Academy empowers families and the community to help develop each child's individual and unique gift through academics and a strong foundation in Jesus Christ, which brings honor and glory to God.[2]

50.     The children at Grant Park Christian Academy receive daily instruction in biblical teachings and participate in chapel services once a week.

51.     Grant Park Christian Academy teaches students according to a Christian curriculum, which offers educational materials from a biblical worldview that focus on academic rigor and encourage critical thinking.

52.     Grant Park Christian Academy instructs on the biblical worldview about marriage, sexuality, and the human person as contained in FAMA's bylaws, which state:

---

[2] *See* Exhibit B, Photo of Grant Park Christian Academy.

Marriage and Sexuality

We believe that the term "marriage" has only one legitimate meaning, and that is marriage sanctioned by God, which joins one man and one woman in a single, covenantal union, as delineated by Scripture. Marriage ceremonies performed in any facility owned, leased, or rented by this corporation will be only those ceremonies sanctioned by God, joining one man with one woman as their genders were determined at birth. Whenever there is a conflict between the corporation's position and any new legal standard for marriage, the corporation's Statement of Faith, doctrines, and biblical positions will govern. (Gen. 2:24; Eph. 5:22-23; Mark 10:6-9; I Cor. 7:1-9.)

We believe that God has commanded that no intimate sexual activity be engaged in outside of marriage as defined in (i) above. We believe that any other type of sexual activity, identity, or expression that lies outside of this definition of marriage, including those that are becoming more accepted in the culture and the courts, are contradictory to God's natural design and purpose for sexual activity. (Gen. 2:24, 19:5; Lev. 18:1-30; Rom. 1: 26-29; 1 Cor. 5:1, 6:9-10; 1 Thess. 4:1-8; Heb. 13:4.)

We believe that God wonderfully and immutably creates each person as male or female. These two-distinct, complementary genders together reflect the image and nature of God and the rejection of one's biological gender is a rejection of the image of God within that person. (Genesis 1:26-27.)[3]

53.     Grant Park Christian Academy follows its religious beliefs about marriage, sexual morality, and the distinction between the sexes, in interactions with students and employees.

54.     It does so in all school operations, including restrooms, dress codes, hiring, admissions, curricula, activities, and daily conversations.

---

[3] Exhibit L, Email from Alfred Johnson, Grant Park Christian Academy to Nedra Harrington, Florida Department of Agriculture and Consumer Services (July 15, 2022); Exhibit M, Letter from Grant Park Christian Academy to USDA (July 15, 2022).

55.     It draws its workforce from among those who share and live out its religious convictions on these matters.

56.     As appropriate, Grant Park Christian Academy teaches children about God's purpose for marriage and that a husband (male) and wife (female) coming together to form a family is critical to the survival of society.

57.     Grant Park Christian Academy maintains sex-separated bathrooms for boys and girls based on their biological differences. It also has separate sex-separated bathroom facilities for its employees and adult visitors.

58.     Grant Park Christian Academy does not allow biological boys to use the girls' bathrooms or vice versa.

59.     Grant Park Christian Academy also maintains sex-specific dress code and uniform policies. For example: female students are permitted to wear skorts; male students are not.

60.     Grant Park Christian Academy does not currently offer organized sports as an extracurricular activity, but if it ever created boys or girls' sports teams, it would not allow biological boys on the girls' teams or vice versa.

61.     Grant Park Christian Academy would not agree to use any child or employee's "preferred" pronouns that do not correspond to biological sex.

62.    Grant Park Christian Academy's website and printed materials will continue to reflect these beliefs and practices, including in its recruitment efforts for school admissions.

**B.    The school lunch program**

63.    An essential part of Grant Park Christian Academy's mission is to ensure that every child is educated and loved. As part of that mission, Grant Park is committed to feeding its students, all of whom qualify for federal food aid. As FAMA's bylaws state, one of the school's main purposes is "providing hope and rebuilding communities through education."

64.    Fifty-six students are currently enrolled at Grant Park Christian Academy for the upcoming 2022-2023 school year. The following number of students are enrolled in each grade level: Kindergarten: 6; First: 5; Second: 7; Third: 10; Fourth: 4; Fifth: 6; Sixth: 6; Seventh: 7; Eighth: 5. The school expects more student enrollments for pre-kindergarten in coming days.

65.    All the students enrolled at Grant Park Christian Academy come from low-income families and many of them from single-parent homes. The families depend on federal and state assistance to provide education and nourishment to their children.

66.    Every student enrolled at Grant Park Christian Academy qualifies to receive financial assistance from the U.S. Department of

Education under Title I of the Elementary and Secondary Education Act, as amended by the Every Student Succeeds Act.

67.    Every student enrolled at Grant Park Christian Academy receives scholarship funds through the Florida Department of Education's school choice scholarship programs, including the Family Empowerment Scholarship (FES) and the Florida Tax Credit Scholarship (FTCS).

68.    All the families at Grant Park Christian Academy fall under the Federal poverty threshold for receiving free meals at school. They rely on Grant Park Christian Academy to provide physical and spiritual nourishment to their children. The school serves balanced, nutritious meals with love and kindness every day during the school year and summer.[4]

### C.    Grant Park Christian Academy's School Lunches

69.    Grant Park Christian Academy participates in the USDA's National School Lunch Program (NSLP), School Breakfast Program (SBP), After-School Snack Program, and Summer Food Service Program (SFSP). For convenience, these programs are called the school lunch program.

70.    The Richard B. Russell National School Lunch Act was signed into law by President Harry Truman in 1946. The program reimburses participating schools for serving free lunches to students from households

---

[4] Exhibit C, 2021-2022 School Lunch Menus.

with incomes at or below 130 percent of the Federal poverty line. The program reaches millions of children nationwide, including 30.4 million children in 2016.[5]

71.     The School Breakfast Program, which began in 1975, reimburses participating schools for the free breakfast served to students from households with incomes at or below 130 percent of the Federal poverty line. In 2016, the SBP reached 14.57 million children nationwide.[6]

72.     Through the After-School Snack Program, participating schools can offer nutritious snacks as part of after-care educational programs or enrichment activities. Schools in which at least 50 percent of students qualify for free or reduced-price meals are subsidized for free snacks. The After-School Snack Program provided an average of 1.2 million snacks daily in fiscal year 2019, with about 194 million snacks served that year. About 92 percent of snacks go to high-need area eligible schools.[7]

73.     Through the Summer Food Service Program or Seamless Summer Option, participating schools can continue the school lunch

---

[5] USDA, National School Lunch Program Fact Sheet, https://www.fns.usda.gov/nslp/nslp-fact-sheet.

[6] USDA, SBP Fact Sheet, https://www.fns.usda.gov/sbp/sbp-fact-sheet.

[7] USDA, After-School Snacks and Meals, https://www.ers.usda.gov/topics/food-nutrition-assistance/child-nutrition-programs/after-school-snacks-and-meals/.

programs and receive reimbursements for providing nutritious meals at no cost to children 18 and under while school is out for the summer.

74.    The Florida Department of Agriculture and Consumer Services (FDACS) disburses USDA funds to reimburse Grant Park Christian Academy for meals served under each of these nutrition programs.

75.    The children and families at Grant Park Christian Academy depend on receiving funds from the USDA and FDACS to put balanced meals in the stomachs of needy children.

76.    For many students, the meals they receive in school are the best meals they eat in a day. Sometimes, they are the only meals.

77.    Nutritious meals are essential to the success of the students both inside and outside the classroom. When the children eat balanced meals, they are healthy and happy, they have more focused attention in the classroom, and their overall behavior improves.

78.    Grant Park Christian Academy has received USDA funding for school meals every year since it first applied for the National School Lunch Program for the 2017-2018 school year.

79.    USDA funding is necessary to cover the essential costs of providing meals. Supported by USDA funds, Grant Park Christian Academy carefully plans monthly breakfast and lunch menus to ensure the children eat a balanced diet. The school orders food and prepares all meals on site in

its warming kitchen. They make every effort to accommodate food-related special needs.

80.    The USDA reimbursed Grant Park Christian Academy about $76,846.06 for breakfast and lunch during the 2021-2022 school year and seamless summer program.

81.    The USDA reimbursed Grant Park Christian Academy about $10,358.00 for after-school snacks during the 2021-2022 school year.

## II.    Title IX of the Education Amendments of 1972

82.    Participation in the federal school lunch program subjects a school in all aspects to Title IX of the Education Amendments of 1972, including all school operations, restrooms, dress codes, hiring, admissions, curricula, activities, athletics, and daily conversations.

83.    Title IX applies institution-wide to "all of the operations" of the school—not just the lunch line. 20 U.S.C. § 1687. As the Department of Justice's Title IX manual states, "The covered education program or activity encompasses *all* of the educational institution's operations including, but not limited to, 'traditional educational operations, faculty and student housing, campus shuttle bus service, campus restaurants, the bookstore, and other commercial activities.' "[8]

---

[8] Dep't of Justice, Title IX Legal Manual, https://www.justice.gov/crt/title-ix (citing S. Rep. No. 64 at 17, reprinted in 1988 U.S.C.C.A.N. at 19).

84.     This manual explains that Title IX's "scope of coverage is no longer limited to the exact purpose or nature of the federal funding." This means "when a recipient is an educational institution, all of the institution's operations are covered by Title IX's antidiscrimination provisions."[9]

85.     Title IX thus encompasses employment decisions. *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530 (1982).

86.     USDA's Title IX regulations illustrate the many reaches of Title IX into a school's activities, such as: 7 C.F.R. § 15a.220 (admissions); *id.* § 15a.300 (admissions); *id.* § 15a.305 (preference in admissions); *id.* § 15a.310 (recruitment); *id.* § 15a.400 (education programs or activities); *id.* § 15a.410 (comparable facilities); *id.* § 15a.415 (access to course offerings); *id.* § 15a.425 (counseling and use of appraisal and counseling materials); *id.* § 15a.430 (financial assistance); *id.* § 15a.435 (employment assistance to students); *id.* § 15a.450 (athletics); *id.* § 15a.500 (employment); *id.* § 15a.505 (employment criteria); *id.* § 15a.510 (recruitment); *id.* § 15a.525 (fringe benefits); *id.* § 15a.540 (advertising); and *id.* § 15a.545 (pre-employment inquiries).

87.     USDA's website also makes clear that Title IX applies to all *people* involved in a school's activities—not merely to students in the lunch line: "Sex discrimination involves treating someone (anyone participating in

---

[9] *Id.*

20

an educational program, service, or activity, e.g., an applicant, employee, participant, or student) less favorably because of that person's sex."[10]

## A. Title IX's equal opportunity and effective accommodation provisions

88. In 1972, Congress enacted Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, to forbid education programs or activities receiving federal financial assistance from discriminating against persons based on their sex.

89. Title IX provides: "[N]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681.

90. Congress enacted Title IX to actively promote equal opportunities for girls. Title IX was "enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities, which was documented in hearings held in 1970 by the House Special Subcommittee on Education." *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004); *see also N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 523 n.13 (1982).

---

[10] USDA, NIFA, Title IX Fact Sheet, https://nifa.usda.gov/sites/default/files/resource/USDA%20NIFA_TitleIX%20Fact%20Sheet_2pages%20508_DOJ%20Remediated.pdf.

91.    Title IX thus focused on equal treatment and effective accommodations. Title IX regulations for instance require athletic opportunities to "effectively accommodate the interests and abilities" of girls and boys. 34 C.F.R. § 106.41(c).

92.    In 1972 when Title IX was passed, "sex" was defined as "one of the two divisions of organic esp. human beings respectively designated male or female."[11] That meaning controls Title IX. *See Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (when a term is not defined it should be given its "ordinary, contemporary, common meaning.").

93.    Language throughout Title IX also reflects that Congress understood "sex" as a biological binary. *See, e.g.*, 20 U.S.C. §§ 1681(a)(2); 1681(a)(8); 1686; 34 C.F.R. § 106.33. For example, Title IX allows schools to change "from being an institution which admits only students of one sex to being an institution which admits students of both sexes." 20 U.S.C. § 1681(a)(2). Title IX regulations likewise not only permit, but require, separate sports teams for girls and boys in contests of speed, strength, or physical contact so that girls can receive an "equal athletic opportunity." 34 C.F.R. § 106.41(c).

---

[11] Webster's New International Dictionary 2081 (3d ed. 1966).

**B.     Title IX's binary understanding of sex**

94.     Title IX is not a sex-blind statute, and "sex" discrimination under Title IX thus does not include "gender identity" discrimination.

95.     The dictionary definition of the term "sex" has never meant gender identity, including when Title IX was enacted in 1972.

96.     For decades, Title IX has been understood to allow distinctions by sex, rather than require an androgenous or interchangeable view of the sexes. 20 U.S.C. §§ 1681; 34 C.F.R. § 106.34(a).

97.     This is why Title IX permits institutions to differentiate and separate intimate facilities by sex. 20 U.S.C. § 1686. "Notwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." *Id.*; *see* 117 Cong. Rec. 30407, 39260, 39263 (1971); 118 Cong. Rec. 5807 (1972).

98.     And this is why, for example, the Supreme Court recognized the need to keep separating sex-specific privacy facilities when integrating women into the Virginia Military Institute. *United States v. Virginia*, 518 U.S. 515, 556–58 (1996) (Ginsburg, J.).

99.     For the same reasons, permitting males to access female private spaces fails to accommodate women. It instead discriminates against them by

23

limiting their equal opportunity to access education—a concern only heightened in school settings involving young children.

### C.    Title IX's religious exemption

100.   Title IX includes a robust religious exemption, which applies automatically by operation of statute. 20 U.S.C. § 1681(a)(3).

101.   Title IX does not apply to covered entities "controlled by a religious organization if the application of [Title IX] would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3).

### D.    *Bostock*'s limited Title VII holding

102.   In *Bostock v. Clayton County*, the U.S. Supreme Court held that terminating an employee "simply for being homosexual or transgender" constitutes discrimination "because of . . . sex" under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, which governs employment. 140 S. Ct. 1731, 1737–38 (2020).

103.   The Court assumed that "sex" in Title VII "refer[s] only to biological distinctions between male and female." *Id.* at 1739. And, even under Title VII, the Court did "not purport to address bathrooms, locker rooms, or anything else of the kind." *Id.* at 1753.

104.   The Court said that "other federal or state laws that prohibit sex discrimination," such as Title IX, were not "before" it, and it declined to

24

"prejudge" whether its decision would "sweep beyond Title VII" to those other laws. *Id.* at 1737–38, 1753.

105.   The Court did not consider or decide what Title IX's statutory phrase "on the basis of sex" means. *Id.* at 1737–38. Nor did the Court address Title IX's safe harbor for sex-separated living facilities or any of the other distinctions Title IX makes between the two biological sexes.

106.   After all, the texts of Title VII and Title IX are materially different. *Compare* 42 U.S.C. § 2000e-2(a) with 20 U.S.C. § 1681(a). "Title VII differs from Title IX in important respects." *See, e.g.*, *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021).

107.   The Supreme Court was also "deeply concerned with preserving" religious institutions' freedom. *Bostock*, 140 S. Ct. at 1753–54.

**E.   Federal enforcement**

108.   USDA operates school meal programs including the National School Lunch Program, School Breakfast Program, and After-School Snack Program to provide nutritionally balanced free lunches, breakfasts, and snacks to children each school day.

109.   In addition, USDA administers, interprets, and enforces Title IX, and it investigates complaints and brings enforcement actions against program participants for Title IX violations. It also administers its own

program of reviewing religious exemptions to Title IX, separate and in addition to Department of Education's program.

110.   Secretary Vilsack has delegated authority to the Assistant Secretary for Civil Rights, 7 U.S.C. § 6918, "to enforce Title IX" and "to enforce related Executive Orders, Congressional mandates, and other laws." 7 C.F.R. § 2.25.

111.   The Office of the Assistant Secretary for Civil Rights receives, investigates, and adjudicates discrimination complaints in USDA programs.[12]

112.   Title IX is also enforced jointly by the USDA Food and Nutrition Service Civil Rights Division[13] and by the USDA National Institute of Food & Agriculture Office of Civil Rights and Equal Opportunity,[14] both of which also collect, investigate, and adjudicate discrimination complaints.

113.   Program participants may file a discrimination complaint with USDA offices through an online form.[15]

---

[12] USDA, Office of the Assistant Secretary for Civil Rights, https://www.usda.gov/oascr; USDA, Center for Civil Rights Enforcement, https://www.usda.gov/oascr/center-civil-rights-enforcement.

[13] USDA, Food and Nutrition Service, About the FNS Civil Rights Division https://www.fns.usda.gov/cr/about-fns-civil-rights-division.

[14] USDA, National Institute of Food & Agriculture, https://www.nifa.usda.gov/about-nifa/civil-rights-policies.

[15] USDA, Filing a Program Discrimination Complaint as a USDA Customer, https://www.usda.gov/oascr/filing-program-discrimination-complaint-usda-customer.

114.   The U.S. Department of Education is concurrently responsible for enforcing and administrating Title IX. 20 U.S.C. §§ 3411, 3441.

115.   The Department of Justice also has the authority to enforce Title IX. Exec. Order No. 12,250, 28 C.F.R. part 41, app. A (1980).

### F.   State enforcement

116.   Under Commissioner Fried, the Florida Department of Agriculture and Consumer Services (FDACS) administers the National School Lunch Program at the state level. FDACS also administers the School Breakfast Program[16] and the After-School Snack Program.[17]

117.   FDACS provides guidance, training, outreach, and technical support to schools operating the program, and it ensures compliance with regulatory guidelines. FDACS reviews and approves applications, and it conducts periodic reviews of the school lunch and breakfast programs to ensure that program sponsors meet all requirements.[18]

---

[16] Commissioner Nicole "Nikki" Fried, School Breakfast Program, https://www.fdacs.gov/Food-Nutrition/Nutrition-Programs/National-School-Lunch-Program/School-Breakfast-Program.

[17] Commissioner Nicole "Nikki" Fried, Afterschool Snack Program, https://www.fdacs.gov/Food-Nutrition/Nutrition-Programs/National-School-Lunch-Program/Afterschool-Snack-Program.

[18] Commissioner Nicole "Nikki" Fried, National School Lunch Program, https://www.fdacs.gov/Food-Nutrition/Nutrition-Programs/National-School-Lunch-Program.

118.   Federal regulations require Commissioner Fried and her agency to assure compliance with Title IX at the application or award stage. 7 C.F.R. §§ 15a.115, 210.23, 225.3, 225.7.

## III.   The Federal Government's School Lunch Mandate

### A.   President Biden's Executive Orders

119.   In January 2021, President Biden declared that *Bostock*'s analysis changed the meaning of all federal sex discrimination laws to address gender identity and sexual orientation: "[i]t is the policy of my Administration to prevent and combat discrimination on the basis of gender identity or sexual orientation, and to fully enforce Title VII and other laws that prohibit discrimination on the basis of gender identity or sexual orientation."[19]

120.   The Executive Order declares that "laws that prohibit sex discrimination—including Title IX of the Education Amendments of 1972, as amended (20 U.S.C. 1681, *et seq*.), . . . along with their respective implementing regulations—prohibit discrimination on the basis of gender identity or sexual orientation, so long as the laws do not contain sufficient indications to the contrary."[20]

---

[19] Exec. Order No. 13,988, 86 Fed. Reg. 7023–25 (Jan. 20, 2021).
[20] *Id.*

121.   Two months later, President Biden issued a second executive order specific to Title IX, with similar provisions: "all students should be guaranteed an educational environment free from discrimination on the basis of sex, including discrimination in the form of sexual harassment, which encompasses sexual violence, and including discrimination on the basis of sexual orientation or gender identity."[21]

### B.   The Departments of Justice and Education's expansive interpretations of *Bostock*

122.   The Departments of Justice and Education then issued documents claiming that Title IX addresses gender identity and sexual orientation, even though both departments had reached the opposite conclusions only months before.[22] These documents specifically discuss the application of this Title IX theory to academic or extracurricular opportunities and to other education programs or activities, including

---

[21] Exec. Order No. 14,021, 86 Fed. Reg. 13,803 (Mar. 8, 2021); *see also* Advancing Equality for Lesbian, Gay, Bisexual, Transgender, Queer, and Intersex Individuals, Exec. Order No. 14,075, 87 Fed. Reg. 37,189 (June 15, 2022) (calling for increased federal agency involvement in this area).

[22] *Compare* Memorandum from Pamela Karlan, Application of *Bostock v. Clayton County* to Title IX of the Education Amendments of 1972 (March 26, 2021), https://www.justice.gov/crt/page/file/1383026/download; Dep't of Educ., Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*, 86 Fed. Reg. 32,637 (June 22, 2021), *with* U.S. Dep't of Justice, Memorandum for the Civil Rights Division Regarding Application of *Bostock v. Clayton County* 4 (Jan. 17, 2021); U.S. Dep't of Educ., Memorandum for Kimberly M. Richey Acting Assistant Secretary of the Off. for Civil Rights Re: *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020) (Jan. 8, 2021), https://bit.ly/3mwKI7H.

restrooms. The documents also detail an expansive theory of harassment liability, which extends to speech and instruction.

123.   Then, together, the departments issued a "Dear Educator" letter and a fact sheet notifying Title IX recipients that the departments "will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity."[23]

124.   These documents interpreted Title IX's ban on gender identity discrimination to require schools to, among other things: give access to sex-separated spaces such as locker rooms or restrooms based on gender identity rather than biological sex; determine the applicability of sex-specific dress codes to individual students based on gender identity rather than biological sex; permit boys who identify as girls to play on girls' sports teams; and refer to gender dysphoric students by their preferred names and pronouns.

125.   The Department of Education also issued guidance on sexual harassment, confirming that it understood any differences in school's codes of conduct or other actions based on sexual orientation or gender identity to fall

---

[23] Letter to Educators on Title IX's 49th Anniversary (June 23, 2021), https://bit.ly/3ksLLDj; U.S. Dep't of Justice & U.S. Dep't of Educ., Confronting Anti-LGBTQI+ Harassment in Schools (June 2021), https://bit.ly/3sQjZnM.

under this prohibited Title IX rubric, including its procedures for handling complaints on campus.[24]

126.   The departments cited two circuit-court cases as support. But the law is far from settled. In one case, a divided panel of the U.S. Court of Appeals for the Fourth Circuit held that a school district violated Title IX by using sex-separated bathrooms, but Justices Thomas and Alito would have reviewed the case. *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *cert. denied* 141 S. Ct. 2878 (2021). In the other case, *Adams v. School Board of St. Johns County*, 968 F.3d 1286 (11th Cir. 2020), the Title IX opinion was later replaced with a narrower decision that "d[id] not reach the Title IX question," *Adams v. School Board of St. Johns County*, 3 F.4th 1299, 1304 (11th Cir. 2021), and then it was vacated when the Eleventh Circuit then granted rehearing en banc. *Adams v. Sch. Bd. of St. Johns Cnty.*, 9 F.4th 1369 (11th Cir. 2021).

127.   A federal court has enjoined since the Department of Education's enforcement and application of these materials in twenty states because they comprise a legislative rule that failed to follow the Administrative Procedure Act's rulemaking procedures. *Tennessee v. U.S. Dep't of Educ.*, No. 3:21-CV-

---

[24] Questions and Answers on the Title IX Regulations on Sexual Harassment 1, 7, (July 2021; updated June 28, 2022), https://bit.ly/3zToUWV.

308, 2022 WL 2791450, at *24 (E.D. Tenn. July 15, 2022). Neither the State of Florida nor the USDA were parties to that lawsuit.

### C.   USDA's School Lunch Mandate

128.   USDA and Florida state officials, however, rely on the Departments of Justice and Education's documents in their own Title IX enforcement.[25]

129.   In the summer of 2021, with no prior notice or public comment, USDA posted on its website a "departmental regulation" redefining sex in Title IX to mean "Sex (including sexual orientation and gender identity)."[26]

130.   USDA's departmental regulation states, "No person will be excluded from participation in, denied the benefits of, or otherwise subjected to discrimination in programs or activities receiving financial assistance from USDA based on . . . Sex (including sexual orientation and gender identity)."[27]

131.   Issued under its Title IX enforcement authority, USDA said that this "regulation applies to all programs and activities receiving Federal financial assistance from USDA Mission Areas and agencies."[28]

---

[25] Exhibit D, USDA, Memorandum, Application of *Bostock v. Clayton County* to Program Discrimination Complaint Processing – Policy Update at 2 (May 5, 2022), https://www.fns.usda.gov/sites/default/files/resource-files/crd-01-2022.pdf. (Policy Update).

[26] Exhibit E, USDA, Departmental Regulation, DR 4330-002, Nondiscrimination in Programs and Activities Receiving Federal Financial Assistance from USDA (July 27, 2021) https://www.usda.gov/sites/default/files/documents/DR4330-002.pdf.

[27] Exhibit E, DR 4330-002, § 4.

[28] Exhibit E, DR 4330-002, § 3 & App. C.

132.   USDA's website directs Title IX complainants to this departmental regulation.[29]

133.   Then, recently, USDA posted several more documents on its website redefining sex to mean sexual orientation and gender identity.

134.   USDA issued a "policy update" that "clarifies prohibitions against discrimination based on sex in all FNS programs found in Title IX of the Education Amendments of 1972" to "prohibit discrimination on the basis of gender identity and sexual orientation."[30]

135.   This policy update cited President Biden's executive orders and said, "In light of *Bostock*, [USDA] has evaluated the statutes it enforces and determined that discrimination based on gender identity and sexual orientation can constitute prohibited sex discrimination under Title IX."[31]

136.   USDA also adopted the Departments of Justice and Education's positions, at two places: "This interpretation is based on the Agency's legal analysis of the statutory text of Title IX, the Title IX *Bostock* interpretations of the Departments of Justice and Education, . . . and the reasoning set forth in *Bostock* and related caselaw."[32] "As to Title IX, FNS concurs with and

---

[29] USDA, Title IX of the Education Amendments Act of 1972, https://www.nifa.usda.gov/about-nifa/civil-rights/title-ix-education-amendments-act-1972.
[30] Exhibit D, Policy Update at 1.
[31] *Id.* at 2.
[32] *Id.*

adopts the Department of Justice's and Department of Education's analyses concluding that Title IX's prohibition on sex discrimination includes a prohibition on discrimination on the basis of gender identity and sexual orientation."[33]

137.   USDA thus incorporated by reference the application of the other departments' Title IX theory to academic, extracurricular, and other education programs or activities, including restrooms, as well as their expansive harassment theory of liability, which extends to speech and instruction.

138.   USDA did not cite the USDA departmental regulation as legal authority because it claimed to derive authority from Title IX itself.

139.   USDA then directed that this policy update must be implemented by state officials administering school programs: "State agencies and program operators should expeditiously review their program discrimination complaint procedures and make any changes necessary to ensure complaints alleging discrimination on the basis of gender identity and sexual orientation are processed and evaluated as complaints of discrimination on the basis of sex."[34]

---

[33] *Id.*
[34] *Id.* at 3.

140.   USDA also directed state officials to distribute the policy update "to local agencies, Program Operators and Sponsors, and all other subrecipients of Federal financial assistance."[35]

141.   Program participants then "should direct questions concerning this memorandum to their State agency," not to USDA.[36]

142.   The policy update attached a letter to States[37] and a question-and-answer document.[38] The letter to the States repeated many of the same points about immediate compliance by program participants.[39]

143.   Per these documents, schools must post new posters and adopt new nondiscrimination statements that say, "In accordance with Federal law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, this institution is prohibited from discriminating on the basis of race, color, national origin, sex (including gender identity and sexual orientation),

---

[35] *Id.*

[36] *Id.*

[37] Exhibit F, USDA, Memorandum to Regional Program Directors and State Agencies (May 5, 2022), https://fns-prod.azureedge.us/sites/default/files/resource-files/crd-01-2022-letter.pdf (State Letter).

[38] Exhibit G, USDA, Memorandum, Questions and Answers Related to CRD 01-2022 Application of *Bostock v. Clayton County* to Program Discrimination Complaint Processing –Policy Update (May 5, 2022), https://fns-prod.azureedge.us/sites/default/files/resource-files/crd-01-2022-qa.pdf (Q&A).

[39] Exhibit F, State Letter at 1.

age, disability, and reprisal or retaliation for prior civil rights activity."[40] (The new posters do not limit the scope of compliance to school feeding programs.)

144.   The Q&A document gave a grace period for non-compliance with adopting the new posters and nondiscrimination statement while USDA is "ordering and displaying posters and reprinting documents."[41]

145.   But, USDA added, "Please note there will not be a grace period for accepting and processing discrimination complaints based on sexual orientation and gender identity in [USDA] programs."[42]

146.   Although USDA was aware of the clash with religious freedom, the policy update deferred these considerations to after-the-fact enforcement actions: "Any action taken by USDA in a specific case will take account of all relevant facts and legal requirements, including, where applicable, Title IX's religious exemption, the Religious Freedom Restoration Act, 42 U.S.C. 2000bb et seq., and any other applicable exemptions."[43]

147.   The Q&A document also said that religious exemptions were not automatic and that schools had to "request a religious exemption with the

---

[40] Exhibit G, Q&A at 2; Exhibit H, USDA, Poster, And Justice For All FNS USE ONLY (revised May 2022), https://fns-prod.azureedge.us/sites/default/files/resource-files/ajfa-green-061322.pdf; Exhibit I, USDA, Nondiscrimination Statement, https://www.fns.usda.gov/civil-rights/usda-nondiscrimination-statement-other-fns-programs.

[41] Exhibit G, Q&A at 3.

[42] Exhibit G, Q&A at 3.

[43] Exhibit D, Policy Update at 3.

U.S. Department of Agriculture" under 7 C.F.R. § 15a.205 "by submitting a written declaration to the Secretary of Agriculture identifying the provisions that conflict with a specific tenet of the religious organization."[44]

148.   After USDA promulgated this school lunch mandate, Secretary Vilsack issued a press release, citing the President's Executive Orders and pledging to "root[] out discrimination in any form – including discrimination based on sexual orientation and gender identity," to "provide . . . an avenue to grieve any discrimination," and to stand "firm" to "bring about much-needed change."[45]

149.   Thus, as the Departments of Education and Justice concluded in the context of sexual orientation and gender identity under Title IX, USDA's new school lunch mandate applies to all school operations, including restrooms, dress codes, hiring, admissions, curricula, activities, athletics, and daily conversations.

**D.   Florida State Officials' Enforcement of the School Lunch Mandate against Grant Park Christian Academy**

150.   Grant Park Christian Academy seeks to participate in the National School Lunch Program for the upcoming 2022-2023 school year.

---

[44] Exhibit G, Q&A at 3.

[45] Exhibit J, USDA, Press Release, USDA Promotes Program Access (May 5, 2022), https://www.fns.usda.gov/news-item/usda-0100.22 (Press Release).

151.   On June 23, 2022, Pastor Alfred Johnson, the Chief Administrator at Grant Park Christian Academy, received an email from Nedra Harrington, Senior Management Analyst of the FDACS's Division of Food, Nutrition and Wellness, containing program updates.[46]

152.   This official email began, "Hi Alfred," and it informed him of the USDA policy memo announcing a new USDA Nondiscrimination Statement and requiring the posting of the new "And Justice for All" posters.[47]

153.   The email stated that Grant Park is required "to update your website and future program materials to include the new statement" from the posters. It noted, "[p]lease keep your current 'And Justice For All' posters up until you receive the new poster."[48]

154.   The new posters incorporate the "sexual orientation and gender identity" language required by the USDA policy memo.

155.   Grant Park Christian Academy has a written policy of non-discrimination pertaining to employees and students. FAMA's non-discrimination policy reads as follows:

> The corporation shall not discriminate against applicants, employees, students, volunteers, and others on the basis of race, color, nationality, or ethnic origin; however, as a religious institution, the corporation reserves the right to deny or terminate employment or to deny or

---

[46] Exhibit K, Email from Nedra Harrington, Florida Department of Agriculture and Consumer Services to Alfred Johnson, Grant Park Christian Academy (June 23, 2022).
[47] *Id.*
[48] *Id.*

terminate any other status of persons whose lifestyle, words, actions or otherwise do not align with the corporation's Statement of Faith, standard of conduct, or other policies of this organization.[49]

156.   Grant Park Christian Academy does not discriminate on the basis of race, color, sex, age, national origin, or disability. As a Christian institution, Grant Park Christian Academy is especially called to love its neighbors.

157.   Grant Park Christian Academy objects, however, to making changes to its school operations, including changes to its restrooms, dress codes, hiring, admissions, curricula, activities, and daily conversations, in ways that conflict with its religious beliefs about marriage, sexuality, and the human person.

158.   Grant Park Christian Academy also objects to hanging posters in its school that express a policy with which it does not agree—a policy that it does not wish to adopt as its own.

159.   Grant Park Christian Academy further should not have to take action to seek affirmative assurances of an exemption in order to be exempt. After all, Title IX's policy and practice has always been that religious organizations are exempt by operation of statute, without having to do anything more.

---

[49] Exhibit L, Email from Alfred Johnson, Grant Park Christian Academy to Nedra Harrington, Florida Department of Agriculture and Consumer Services (July 15, 2022); Exhibit M, Letter from Grant Park Christian Academy to USDA (July 15, 2022).

160.   Grant Park Christian Academy will gladly feed any and every hungry child enrolled as a student.

161.   On July 15, 2022, Grant Park Christian Academy sent an email to Ms. Harrington explaining that Title IX does not address gender identity or sexual orientation. It also pointed to why, even if Title IX addressed those subjects, the school would have a religious exemption. This email states:

Dear Nedra,

At Grant Park Christian Academy, we serve kids primarily from our low-income, minority community here in Tampa. Our schools' parents depend on Step Up scholarships to get their kids a Christian education, and our kids depend on our school's lunch program to get them good meals every day. To be clear, we would never deny a hungry child food, regardless of who that child is or how he or she identifies.

Based on your email, however, we're very concerned that the Florida Commissioner of Agriculture wants to go far beyond requiring schools to provide food to everyone. Rather, your email threatens to take school lunches away from our kids unless we stop living out our religious convictions and by doing things like allowing a gender dysphoric boy to use girls' private spaces.

Title IX has never required schools to do this, and, even if it did, our school would always have been exempt. The attached portion of our lunch application for the coming school year, which we have submitted online, has everything written down in detail.

Our parents need to know now if their kids will be able to keep eating lunch at school—both right now, this summer, and next school year. I request that you promptly confirm that Title IX never required schools to do this, and that our kids can keep receiving their lunches, by no later than Friday, July 22, 2022 at 5pm.

Thanks,

Pastor Alfred Johnson

This email attached the explanatory statement that the school created as part of the school's lunch application for next school year.[50]

162.   Grant Park Christian Academy simultaneously sent a letter to the Secretary of Agriculture, Tom Vilsack, requesting that the USDA acknowledge that Grant Park Christian Academy is exempt from Title IX and

---

[50] Exhibit L, Email from Alfred Johnson, Grant Park Christian Academy to Nedra Harrington, Florida Department of Agriculture and Consumer Services (July 15, 2022).

its accompanying regulations as long as they are interpreted or applied to curtail Grant Park Christian Academy's freedom to act in accordance with its religious beliefs.[51]

163.   On July 18, 2022, Grant Park Christian Academy received an email response from Lisa Church, Chief of the FDACS's Bureau of Child Nutrition Programs.[52]

164.   Her response began, "Good Afternoon Mr. Johnson," and it read:

> The policy bites sent out by Ms. Harrington are federal regulations that the state agency must provide to participating schools by USDA guidelines. In order to receive federal funding all participating schools must comply with all federal regulations in the National School Lunch Program. Please remember your school is not required to participate in the National School Lunch Program. However, participating schools must comply with all federal program regulations.[53]

165.   Her message then pasted in text from "[d]irect messaging sent to our agency from USDA." That messaging requires that participating institutions must "update their nondiscrimination policies, informational materials and websites to include prohibitions against discrimination based on gender identity and sexual orientation."[54]

166.   Ms. Church did not confirm that Grant Park Christian Academy has a religious exemption and did not address Grant Park's concern that the

---

[51] Exhibit M, Letter from Grant Park Christian Academy to USDA (July 15, 2022).

[52] Exhibit A, Email from Lisa Church, Florida Department of Agriculture and Consumer Services, to Alfred Johnson, Grant Park Christian Academy (July 18, 2022).

[53] *Id.*

[54] *Id.*

policy memo requires Grant Park to violate its religious beliefs. Instead, her response indicates that Grant Park should simply withdraw from the school lunch program if it's unwilling to compromise its religious beliefs.[55]

167.   USDA regulations state that religious exemptions must be claimed from the agency in a written form. This regulation indicates that USDA or the state officials would not let Grant Park participate in the program while USDA is processing Grant Park's exemption letter. It also indicates that any non-compliant activity before an exemption is granted is subject to potential Title IX liability.

168.   Grant Park Christian Academy has not yet received any response from USDA about its request for an assurance of its religious exemption.

169.   But USDA's school lunch mandate says that compliance is required immediately to be eligible to participate in a funding program. So the luxury of waiting indefinitely to receive an exemption is not practical if the school wishes to remain in the program and continue feeding its students during the coming school year.

170.   Christian schools thus must decide now whether to comply in the meantime or risk incurring potential liability.

---

[55] *Id.*

171.   Meanwhile, Grant Park Christian Academy is preparing to resume classes for the upcoming 2022-2023 school year.

172.   Classes are scheduled to begin on August 10, 2022.

173.   There will be an open house for students and families on August 5, 2022.

174.   Grant Park Christian Academy wants to ensure the children and families of its continued participation in school meal programs for the students while remaining free to live out its Christian beliefs and to serve the local neighborhood community with love.

175.   If the USDA rejects Grant Park Christian Academy's request for exemption or fails to approve its application to participate in the National School Lunch Program in time for school beginning in August, the school risks losing a substantial percentage of its enrollment for the 2022-2023 school year and will face having to close its doors to the needy children of the Grant Park neighborhood.

176.   Grant Park Christian Academy has thus held an emergency parents meeting. Its pastor told parents that the Biden Administration and Commissioner Fried's school lunch mandate threatens the school's ability to keep providing meals and serving students, unless the school violated its religious beliefs.

**E.    Title IX's religious exemption**

177.    Properly understood, Title IX has no conflict with Grant Park Christian Academy's religious beliefs. In the same way, properly understood, Title IX's religious exemption applies by operation of statute, no action required.

178.    But now USDA has created a conflict by creating its school lunch mandate, and USDA has a regulation that purports to require schools to write to USDA to "claim" an exemption:

> An educational institution or other entity that wishes to claim the exemption set forth in paragraph (a) of this section *shall* do so by submitting in writing to the designated agency official a statement by the highest-ranking official of the institution, identifying the provisions of this part that conflict with a specific tenet of the religious organization.

7 C.F.R. § 15a.205. (emphasis added).

179.    Unlike USDA, the U.S. Department of Education agrees that "there is no 'application process' set forth in the Title IX statute":

> No part of the statute requires that recipients receive an assurance letter from [the government], and no part of the statute suggests that a recipient must be publicly on the record as a religious institution that claims a religious exemption before it may invoke a religious exemption in the context of Title IX.[56]

---

[56] U.S. Dep't of Educ., Direct Grant Programs, State-Administered Formula Grant Programs, Non Discrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, Developing Hispanic-Serving Institutions Program, Strengthening Institutions Program, Strengthening Historically Black Colleges and Universities Program, and Strengthening Historically Black Graduate Institutions Program, 85 Fed. Reg. 59,916-01, 59,946 (Sept. 23, 2020).

180. For this reason, the Department of Education deleted its own application regulation, noting its own "delays in responding to inquiries about the religious exemption"—delays which led to confusion and which "may have caused educational institutions to become reluctant to exercise their rights under the Free Exercise Clause of the First Amendment."[57]

181. Grant Park Christian Academy thus is exempt from any Department of Education enforcement of Title IX by operation of law—a position that the Department of Education states that it will respect, unlike USDA or Florida state officials.

182. This is what Title IX requires, and USDA has no power to change that.

## IV. Harm to Grant Park Christian Academy and the Children It Serves

183. Upon information and belief, based on email exchanges, the Florida officials will not renew Grant Park Christian Academy's school lunch funding if the school does not comply with the new mandates; or, if program participation is allowed, the school will incur potential liability for non-compliance in its school operations, including in restrooms, dress codes, hiring, admissions, curricula, activities, and daily conversations.

---

[57] *Id.*; U.S. Dep't of Educ., Direct Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026, 30,480, 30,573 (May 19, 2020).

184.   Grant Park Christian Academy has a current, direct, and legally protected interest in the continuation of USDA funding for the school lunch program, which it has relied on for over five years.

185.   Because federal and state officials have already started their process of reviewing applications for approval for the 2022-2023 school year, children at Grant Park Christian Academy and at other schools face imminent irreparable harm.

186.   By threatening that funding, officials' actions violate the legal rights of Grant Park Christian Academy and its children.

187.   Grant Park Christian Academy now faces two untenable choices for the future: (1) cease providing school lunches and lose many students, or (2) comply with the school lunch mandate and abandon its religious beliefs in its school operations, including in its restrooms, dress codes, hiring, admissions, curricula, activities, and daily conversations.

188.   In the meantime, Grant Park Christian Academy may already be in violation and face enforcement actions because, in the eyes of the federal and state officials, Title IX always addressed gender identity and sexual orientation, and USDA has not given Grant Park Christian Academy a written exemption. But Title IX does not reach these bases, Title IX itself requires no written request for an exemption, and therefore USDA cannot require one for a school to be exempt. USDA's regulation requiring an

exemption thus unnecessarily puts schools entitled to an exemption at risk of public harassment by those who are intolerant of their religious beliefs.

### A. Nutritional and educational injuries to the school

189. Without food at school each day, many children at Grant Park Christian Academy would go hungry. The children would suffer physically, in their health outcomes, as well as emotionally and socially in their educational outcomes.

190. Hungry children suffer from poor nutrition and malnutrition, impeding their physical well-being and growth.

191. Hungry children cannot learn well, and they often have greater struggles behaviorally and socially in the classroom.

192. In the past, the federal government has acknowledged that hunger can hinder educational success. For example, Commissioner Fried's website says that the National School Lunch Program (1) enhances academic performance and behavior by ensuring that students receive the nutrition they need to stay focused; and (2) improves students' nutritional intake of fruits, vegetables and whole grains.[58] Likewise, her website says that the snack program "[a]llows students additional access to fruits, vegetables, milk and whole grains, many of which are locally grown, Florida products," and

---

[58] Commissioner Nicole "Nikki" Fried, National School Lunch Program, https://www.fdacs.gov/Food-Nutrition/Nutrition-Programs/National-School-Lunch-Program.

"[p]rovides additional school-based educational and enrichment opportunities for students in afterschool care settings."[59]

193.   Grant Park families are of limited means and school lunches are often the best meals that many children at Grant Park Christian Academy eat each day.

194.   Grant Park families thus depend on sending their children to a school in which healthy meals are provided for free.

195.   Just as how students could not come to Grant Park Christian Academy without the generosity of external scholarships, many—if not all—students could not come to Grant Park Christian Academy if meals were not provided.

196.   In the school's experience, no matter how much parents value their children's education at Grant Park Christian Academy, if a family is forced to choose between the best education for their child and just having food to eat each day, many families will be constrained to choose a less desirable educational setting that has the advantage of free daily meals.

197.   Absent federal food aid, Grant Park Christian Academy would lack sufficient funds to provide meals for every student every day.

---

[59] Commissioner Nicole "Nikki" Fried, Afterschool Snack Program, https://www.fdacs.gov/Food-Nutrition/Nutrition-Programs/National-School-Lunch-Program/Afterschool-Snack-Program.

198.   Student scholarship funds from external sources do not cover the costs of breakfasts, lunches, and snacks.

199.   Despite ongoing fundraising efforts, the school operates on a narrow margin at a small campus, and staff receive only modest compensation. All resources are already directed in the greatest way possible to students and families in need.

200.   Without federal funding for school meals, the school has a high degree of certainty that half or more of the children at Grant Park Christian Academy would be unable to keep coming to school. This would dramatically reduce admissions and raise serious questions about the school's future.

201.   The families likely will also lose the ability to have a religious education because many children will have no choice but to attend public, secular schools with ongoing free meal programs that are not under threat. Families who choose Grant Park Christian Academy make serious personal and financial decisions to enable their children to have the best education possible.

202.   Grant Park Christian Academy would then suffer serious injuries to its ability to pursue its educational and religious mission, including financial injuries proportionate to the number of lost lunches or lost students.

203.   The Faith Action Ministry Alliance seeks to rebuild neighborhoods, one family at a time. Grant Park Christian Academy advances that mission by supporting entire families, not just students.

204.   As a result, if children cannot attend Grant Park Christian Academy, whole families and, by extension, the whole community in which they live will suffer serious harm.

205.   Grant Park Christian Academy and its children are adversely affected and aggrieved by the officials' actions.

206.   The government officials' lack of clarity and transparency in its process created confusion and disruption for Grant Park Christian Academy, its children, its families, and the public.

207.   The school lunch mandate also harms the school's students and employees, including their privacy, religious, liberty, educational, professional, associational, and recreational interests, in school operations, including restrooms, dress codes, hiring, admissions, curricula, activities, and daily conversations.

208.   The school lunch mandate also has caused Grant Park Christian Academy to expend time and resources to seek exemptions from the federal and state officials, both in its application and by direct correspondence. These compliance costs, while modest compared to the threatened loss of student

lunch program funding, diverted staff time and technological resources from its educational mission.

209.   Grant Park Christian Academy has been injured by the government's actions because it has been forced to respond to requirements that Title IX does not impose and seek an exemption to which it is already entitled.

210.   Being forced to seek an exemption through a letter to USDA also created a reputational and privacy injury for Grant Park Christian Academy, as well as increased security risks.

211.   Activists regularly seek exemption letters through the Freedom of Information Act to subject religious schools to a self-styled name-and-shame harassment campaign, which is why these activists pressure the federal government to require exemption requests from religious schools.[60]

212.   Grant Park Christian Academy would not have incurred these injuries if USDA had not created the school lunch mandate or failed to respect statutory religious exemptions.

---

[60] *See, e.g.*, Human Rights Campaign, Blueprint for Positive Change 2020, https://hrc-prod-requests.s3-us-west-2.amazonaws.com/Blueprint-2020.pdf; Human Rights Campaign, HRC Calls on Department of Education to Take Action Following Anti-LGBT Religious Exemption Requests (Dec. 18, 2015), https://www.hrc.org/press-releases/hrc-calls-on-department-of-education-to-take-action-following-anti-lgb2.

**B.      Injury to the school's speech and religious exercise**

213.   The school lunch mandate injures Grant Park Christian Academy's ability to be faithful to its beliefs in its school operations, including restrooms, dress codes, hiring, admissions, curricula, activities, and daily conversations.

214.   The school lunch mandate injures Grant Park Christian Academy's ability to draw its workforce from those who share its beliefs.

215.   The school lunch mandate injures Grant Park Christian Academy's ability to offer a Christian school environment in which students receive religious and age-appropriate instruction.

216.   The school lunch mandate injures Grant Park Christian Academy's ability to offer a faith-filled traditional curriculum and maintain age-appropriate educational options reflecting its faith.

217.   The school lunch mandate injures Grant Park Christian Academy's ability to maintain separate dress codes by sex for students.

218.   The school lunch mandate injures Grant Park Christian Academy's ability to reserve private spaces such as restrooms for access by biological sex.

219.   The school lunch mandate injures Grant Park Christian Academy's ability to offer activities that take due account of sex, including any future athletic activities.

220.   The school lunch mandate injures Grant Park Christian Academy's ability to use the pronouns associated with an individual's biological sex, not gender identity.

221.   In its operations, curriculum, and religious services, Grant Park Christian Academy reflects the Christian understanding of marriage, sexuality, and the human person, in which sex differences are respected and in which sexual activity is reserved for a marriage of one man and one woman.

222.   If Grant Park Christian Academy were to comply with Defendants' demands, including its expansive understanding of Title IX harassment, its children and teachers would be forced to communicate messages they believe are false—that gender identity, rather than biological reality, fundamentally shapes and defines who we truly are as humans; that our sex can change; and that a woman who identifies as a man really is a man, and vice versa.

223.   But if Grant Park Christian Academy resists this school lunch mandate, and if its children and teachers refer to students based on their biological sex, they communicate the views they actually believe—that our sex shapes who we are as humans; that this sex is fixed in each person by God, and that it cannot be changed, regardless of our feelings or desires.

224.   The school lunch mandate censors and compels speech and burdens religious exercise in many ways, such as by prohibiting teachers from telling students that they may only access restrooms or other private spaces based on their biological sex; by requiring teachers to use preferred pronouns contrary to biological sex; and by creating educational records and applications contrary to biological sex.

225.   The school lunch mandate harms the school by forcing the school to post USDA posters and adopt USDA policies referencing sexual orientation and gender identity, and by forbidding the use of prior USDA posters or policies that respected the proper scope of Title IX.

226.   The school lunch mandate also censors and compels speech and burdens religious exercise by requiring the school to adopt and live by a policy contrary to the school's Christian view of marriage, sexuality, and the human person by interfering with the school's curriculum, and by impairing the faithful integrity of its religious chapel services.

227.   The school lunch mandate censors and compels Grant Park Christian Academy's website and printed materials, which reflect these beliefs and practices, including in its recruitment efforts for school admissions.

228.   Many other public and private primary and secondary schools have, and always have, separated student facilities, programming, and

activities by biological sex and they have communicated policies reflecting this understanding of sex. If any schools were to comply with the school lunch mandate, they would face immediate compliance costs in the form of new policies, training, and facilities.

229.   In sum, compliance with the school lunch mandate would alter virtually every aspect of school operations, including restrooms, dress codes, hiring, admissions, curricula, activities, and daily conversations, as well as the Faith Action Ministry Alliance's broader community efforts, such as its volunteer educational activities. All these activities reflect the school's Christian focus, which would be impaired if the federal school lunch mandate requires it to no longer abide by Biblical understandings of marriage, sexuality, and the human person.

## C.   Procedural injury

230.   Had the government undergone a notice and comment process under the Administrative Procedure Act, Grant Park Christian Academy and the public would have had proper notice of the change and the opportunity to submit public comments, which the agency would have had to consider and rationally discuss if it wished to finalize the change properly.

231.   But the agency did not undergo the notice and comment process under the Administrative Procedure Act, and so Grant Park Christian Academy and the public lost that opportunity. Grant Park Christian

Academy and others had no chance to urge the agency to keep its current, correct interpretation of Title IX.

232.   If the agency undergoes a future notice and comment process under the Administrative Procedure Act, Grant Park Christian Academy intends to submit comments (1) raising reasons not to reinterpret Title IX to reach new protected classes, (2) discussing its reliance interests in continued coverage for its school meals, and (3) suggesting possible alternatives that respect biological reality, student privacy, and religious liberty.

233.   There is a reasonable chance that the agency would make a different decision if the school lunch mandate is delayed, enjoined, and remanded until the agency complies with the APA.

## V.   USDA's school lunch mandate comprises final agency action subject to judicial review under the Administrative Procedure Act

234.   USDA's expansion of Title IX is a final agency action reviewable under the Administrative Procedure Act.

235.   USDA's publication of the school lunch mandate on its website— the departmental regulation, the state letter, the policy update, and the Q&A—consummated the agency decision process and issued a rule in final form.

236.   The school lunch mandate delineates the scope of obligations, rights, and benefits for the public, including for federal officials, state

agencies, program participants, and the public, because USDA intends its announcements to impose a mandate on federal officials and state agencies to require program participants to abide by Title IX as if it covered sexual orientation and gender identity as protected classes.[61]

237.   The departmental regulation sought to impose a new Title IX mandate on the *back end* of USDA programs—through the bringing of complaints for past conduct, through after-the-fact enforcement, and through deterrence by retroactive liability.

238.   The other documents sought to coerce affirmative compliance on the *front end* of USDA programs, by making affirmative compliance a condition of even participating in USDA programs. All documents used similar binding language.

239.   USDA insists on the binding nature of its mandate: for instance, the departmental "regulation applies to all programs and activities receiving Federal financial assistance from USDA Mission Areas and agencies."[62]

240.   USDA also required that this new mandate be enforced on program participants: "USDA will enforce this policy through the fair and efficient processing and addressing of complaints of discrimination and non-compliance with civil rights laws filed against recipients of USDA financial

---

[61] Exhibit E, DR 4330-002, § 4.

[62] *Id.* at § 3.

assistance"[63]; "USDA will also enforce this policy through civil rights compliance reviews"[64]; and USDA's new position "will impact the processing of program discrimination complaints, effective immediately."[65]

241.   USDA then invited public complaints so that it may enforce this new requirement against schools: "Any individual or group of individuals that believe they have been subjected to discrimination in a program or activity receiving Federal financial assistance from USDA may file a complaint with the Secretary of Agriculture (Secretary), or the Assistant Secretary for Civil Rights (ASCR) or their designee."[66]

242.   USDA also promises to investigate these complaints: USDA "Will promptly investigate all accepted complaints that indicate a possible failure by a recipient to comply with any applicable civil rights law, rule, regulation, or policy," unless a procedural error exists or good cause not to investigate is documented.[67]

243.   USDA then will start enforcement proceedings, which may include payment of damages where permitted by law and may include action

---

[63] Exhibit E, DR 4330-002, § 4.
[64] *Id.*
[65] Exhibit F, State Letter at 1.
[66] Exhibit E, DR 4330-002, § 5(a)(1).
[67] *Id.*

under 7 C.F.R. §§ 15.8-15.10 to terminate or suspend all USDA financial assistance to the recipient.[68]

244.   The policy update and the state letter required immediate compliance by States and program participants to join or stay in meal programs, under the Biden Administration's theory of "new protected bases" in Title IX.[69]

245.   The Q&A document outlined "next steps" that "must be taken by State Agencies and program operators": "program operators will have to update their program discrimination complaint processing procedures for allegations related to services and activities receiving federal financial assistance from the USDA to ensure discrimination complaints alleging sexual orientation and gender identity discrimination are processed as complaints of prohibited sex discrimination."[70]

246.   The Q&A document also told program participants that they had to adopt USDA's new policy as their own and display it on posters at their schools: "State Agencies and program operators will need to update their Nondiscrimination Statements and order new And Justice for All posters that reference gender identity and sexual orientation discrimination."[71]

---

[68] Exhibit E, DR 4330-002, §§ 5–6.
[69] Exhibit D, Policy Update at 1-3; Exhibit F, State Letter at 1.
[70] Exhibit G, Q&A at 2.
[71] *Id.*

247.   And the press release repeated that "state and local agencies, program operators and sponsors that receive funds from [USDA] must investigate allegations of discrimination based on gender identity or sexual orientation" and "must also update their non-discrimination policies and signage to include prohibitions against discrimination based on gender identity and sexual orientation."[72]

248.   The school lunch mandate is not labeled as optional or advisory, either for the agency's officials, or for state agencies, or for the public.

249.   Any program participant that disregards USDA's new definition of sex in Title IX will face various and significant legal consequences.

250.   Program participants thus must alter their nondiscrimination policies to include these protected classes or face significant legal and financial liability—and loss of participation in USDA programs.

251.   The school lunch mandate is final agency action.

252.   The school lunch mandate is thus subject to the Administrative Procedure Act's requirement of reasoned decision making.

253.   The school lunch mandate makes a substantive change. It changes USDA's interpretation, application, and enforcement of Title IX to

---

[72] Exhibit J, USDA, Press Release, USDA Promotes Program Access (May 5, 2022), https://www.fns.usda.gov/news-item/usda-0100.22 (Press Release).

add new "protected bases," and it seeks to impose that change on officials, States, schools, and the public.

254.   The school lunch mandate thus is an improperly-issued legislative rule subject to the Administrative Procedure Act's notice-and-comment requirements.

## VI.   The government did not meet procedural requirements

255.   The federal government did not follow the Administrative Procedure Act's requirements of notice and comment rulemaking or of reasoned decision making.

### A.   No notice or public comment

256.   USDA never gave prior notice of its school lunch mandate re-defining sex in Title IX or published it in the Federal Register.

257.   USDA did not delay the effective date of the school lunch mandate for 30 days until after publication of a final rule in the Federal Register.

258.   Instead, each aspect of the school lunch mandate was posted on USDA's website without prior warning, effective immediately.

259.   None of these documents was signed by or issued by the authority of any Senate-confirmed official.

260.   USDA never solicited, reviewed, or responded to public comments about the school lunch mandate or any change to the interpretation or enforcement of Title IX.

261.   USDA's website says that departmental regulations do not go through a notice or comment process. Another departmental regulation on USDA's website prescribes the policies, responsibilities, standards, and procedures for issuing departmental regulations—all of which are solely internal to the federal government.[73]

262.   The government's other documents—its state letter, its policy update, and its Q&A—did not reveal that they were subject to comment.

263.   The government did not offer any good cause for omitting these rulemaking procedures.

**B.   No reasoned decision making**

264.   The government did not explain its new departmental regulation at all, and it gave no reason for its addition of new protected classes. The agency did not even show awareness of the change.

265.   USDA did not justify its state letter, its policy update, and its Q&A other than by reference to Title IX and to the improperly issued legislative rules of other agencies.

---

[73] Departmental Directives System, DR 0100-001 (January 4, 2018), https://www.usda.gov/directives/dr-0100-001.

266.   In issuing the school lunch mandate, the government discussed no reliance interests, and considered no alternatives to adding this language.

267.   USDA thus did not consider any issues that might have been raised in comments, such as reliance interests or alternative policies.

268.   No after-the-fact explanations of this decision can suffice under the APA because the agency must explain its decision when it was made.

269.   There is no good-cause exception to the requirement of reasoned decision making, but, in any event, the government did not claim any exception applies.

## VII.   Judicial relief is necessary and appropriate to stop the government from taking away children's lunches

270.   Injunctive relief is necessary to avoid Grant Park Christian Academy from losing current and future meals; from losing the ability to teach and feed its students; and from losing the exercise of its rights to free speech and free exercise of religion.

271.   Judicial relief is thus necessary and appropriate to maintain the status quo, as well as to hold unlawful and set aside state and USDA enforcement.

272.   The government would suffer no harm from the relief requested.

273.   An injunction would simply revert Title IX enforcement how it has been understood and enforced for the last fifty years.

274.   All the acts of the Defendants described above, and their officers, agents, employees, and servants, were executed and are continuing to be executed by Defendants under the color and pretense of the policies, statutes, ordinances, regulations, customs, and usages of the United States and the State of Florida, respectively, and they are acting in concert with each other.

275.   Under 5 U.S.C. § 701(a), no statute precludes judicial review of the agency actions, and they are not committed to agency discretion by law.

276.   Plaintiff has no adequate remedy available at law.

277.   Plaintiff has no adequate or available administrative remedy. In the alternative, any administrative remedy would be futile.

## CLAIMS FOR RELIEF

### CLAIM ONE

### ADMINISTRATIVE PROCEDURE ACT
### (5 U.S.C. § 706)

### WITHOUT PROCEDURE REQUIRED BY LAW
### & CONTRARY TO LAW

278.   Plaintiff re-alleges and incorporates as though fully set forth, paragraphs 1–277 of this complaint.

279.   Under the Administrative Procedure Act, agencies must follow public notice and comment procedures before they make final, binding rules.

280.   A reviewing court must "hold unlawful and set aside agency action" if the agency action is "without observance of procedure required by

law," "not in accordance with law," or "contrary to constitutional right, power, privilege, or immunity" under 5 U.S.C. § 706(2)(A)–(D).

281.   The court may issue temporary and preliminary injunctive relief and any other "necessary and appropriate process . . . to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

282.   **No notice and publication.** The government officials did not give prior notice of their actions, such as by publishing them in the Federal Register.

283.   The public had no way to know that the government planned to add new protected classes to Title IX, or what doing so might mean. It thus no adequate opportunity to comment on such a proposal and the government's rationale for it, much less to comment on the effects of such a change.

284.   Thus, the government violated the requirement that an agency must publish a general notice of proposed rulemaking in the Federal Register, including "a statement of the time, place, and nature of public rule making proceedings" and "either the terms or substance of the proposed rule or a description of the subjects and issues involved," or else find good cause to omit these procedures on the record. 5 U.S.C. § 553(b).

285. **No public comment.** The agency actions were not the subject of an opportunity for public comment to the government, either before or after they were taken.

286. The government did not collect, review, or consider public comments before issuing the actions.

287. There was no specific request for comment on adding new protected classes to Title IX, let alone on the rationale for doing so, or on the import of such a change.

288. The government did not receive, review, meaningfully consider, or consider at all those comments before or after issuing its actions.

289. Thus, the government violated the requirement for a legislative or substantive rule that "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c).

290. The government made no finding of good cause for omitting either of these procedures, nor did it purport to make such a finding.

291. **No Senate-confirmed official.** The agency actions also failed to follow procedures required by the U.S. Constitution.

292. The omission of rulemaking procedures violated the due process of law guaranteed by the Fifth and Fourteenth Amendments of the U.S. Constitution.

293.   No Senate-confirmed official signed or authorized each agency action, and thus their issuance and implementation violate the U.S. Constitution's Appointments Clause. U.S. Const. art. II § 2. Only a principal officer of the United States may exercise these powers, including the signing and promulgation of rules, and any inferior officer must be supervised by a principal officer in the enforcement of these rules.

294.   Therefore, the agency actions must be held unlawful, set aside, and preliminarily and permanently enjoined under the APA and the Court's inherent equitable power to enjoin ultra vires and unconstitutional actions, *Larson*, 337 U.S. at 689-91.

**CLAIM TWO**

**ADMINISTRATIVE PROCEDURE ACT**
**(5 U.S.C. § 706)**

**ARBITRARY, CAPRICIOUS, & AN ABUSE OF DISCRETION**

295.   Plaintiff re-alleges and incorporates as though fully set forth, paragraphs 1–277 of this complaint.

296.   Under the APA, a reviewing court must "hold unlawful and set aside agency action" if the agency action is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

297.   The agency actions are arbitrary, capricious, and an abuse of discretion. They lack reasoned decision making.

298.   USDA offered no rationale in its departmental regulation describing why it was adding new protected classes to Title IX, or even acknowledging that it had done so.

299.   Likewise in the final state letter, policy update, and Q&A, USDA failed to offer a proper rationale for this change.

300.   USDA failed to consider the text, structure, legislative history, and historical judicial interpretation of Title IX and its implementing regulations, all of which confirm that "sex" means biological sex—that is, a person's status as male or female as determined by biology.

301.   USDA failed to address, much less consider or adequately consider important aspects of the problem that led to or would be caused by this change, such as the disruption caused by removing benefits or the degree of regulatory uncertainty that the new actions create for children and schools. In particular, the government failed to consider or adequately consider reliance interests of children and schools in continuing school meal programs.

302.   USDA failed to consider the impact on private religious schools, universities, and colleges and the students that attend them, including their First Amendment interests in freedom of speech, religion, and association; their interests under the Religious Freedom Restoration Act; their other liberty interests; their interests in allowing sex-segregated facilities; and their interests in allowing sex-segregated athletic teams.

303.   USDA failed to consider that its redefinition of Title IX will create inconsistent and confusing standards, allow absurd results, lead to discrimination, and undermine other sex-based classifications because the text, structure, legislative history, and historical judicial interpretation of Title IX and its implementing regulations impose requirements that "sex" means biological sex—that is, a person's status as male or female as determined by biology.

304.   The federal government failed to adequately acknowledge that this is a change in position from its existing regulations and its initial post-*Bostock* guidance.

305.   USDA failed to consider the reliance and structural interests of the States and other grant recipients, especially States accepting federal funds contingent on compliance with Title IX.

306.   USDA failed to adequately consider any alternative policies that respect the interests of private religious schools, universities, and colleges and their students, including their female students and female student-athletes, such as (1) taking no action; (2) creating rules to protect female sports and privacy under the correct understanding of Title IX; (3) grandfathering existing categories of programs and practices covered by Title IX; (4) confirming that a religious exemption applies under Title IX, the Religious Freedom Restoration Act, and the First Amendment, even in the

context of sexual orientation and gender identity, and by operation of statute; and (5) creating or expanding existing exemptions for those with safety concerns, moral objections or other reliance on past policies.

307.    USDA completely failed to address significant comments, because it did not collect comments. Public comments likely would have raised concerns and objections about this change.

308.    In making this change USDA relied on facts, studies, legal theories, and recommendations only from one side of the issue, and it ignored other evidence and experts, who do not support ignoring biological realities. USDA, for example, failed to adequately consider that sex is a biological reality, and there is an evolving state of medical and scientific knowledge about gender that the federal government should not circumvent by rulemaking.

309.    The school lunch mandate relies on the erroneous legal view that *Bostock* requires new protected classes in Title IX. Without that mistaken view, there is a reasonable possibility that the school lunch mandate would not have been issued.

310.    Therefore, the agency actions must be held unlawful, set aside, and preliminarily and permanently enjoined under the APA.

## CLAIM THREE

## ADMINISTRATIVE PROCEDURE ACT
### (5 U.S.C. § 706)

## CONTRARY TO LAW & WITHOUT STATUTORY AUTHORITY

311.   Plaintiff re-alleges and incorporates as though fully set forth, paragraphs 1–277 of this complaint.

312.   Under the APA, a reviewing Court must "hold unlawful and set aside agency action" if the agency action is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "contrary to constitutional right, power, privilege, or immunity" under 5 U.S.C. § 706(2)(A)–(C).

313.   Likewise, a court must "compel agency action unlawfully withheld." U.S.C. § 706(1).

314.   In two ways, the agency actions are not in accordance with law, and are in excess of statutory jurisdiction, authority, and limitations, and contrary to constitutional rights and power.

315.   **Contrary to Title IX's definition of sex.** First, this school lunch mandate exceeds the authority of Title IX of the Education Amendments of 1972, as amended, which does not address gender identity or sexual orientation. 20 U.S.C. § 1681.

316.   Under the text, structure, legislative history, and historical judicial interpretation of Title IX and its implementing regulations, "sex"

means biological sex—that is, a person's status as male or female as determined by biology.

317.   Title IX and longstanding regulations expressly permit distinctions based on biological sex in certain circumstances.

318.   The school lunch mandate not only lacks statutory authority for its new sex-blindness requirements involving sexual orientation and gender identity but also conflicts with Title IX's promises of equal opportunity and effective accommodation for girls and boys.

319.   Title IX and its related regulations consider whether "program components reveal that treatment, benefits, or opportunities are not equivalent in kind, quality or availability" between the sexes. 44 Fed. Reg. at 71,415.

320.   As a result of profound physiological differences between the sexes, both before and after puberty, equal opportunity and effective accommodation for both sexes not only allows, but requires, in Title IX that schools provide separate facilities, including restrooms and physical education activities, for boys and girls.

321.   This reading of Title IX and its regulations is compelled by the U.S. Constitution's clear-notice rule. This rule is a substantive canon of statutory interpretation that applies because Title IX displaces traditional

state police power authority, abrogates state sovereign immunity, and attaches conditions to spending programs.

322.   USDA's reading of Title IX also violates the major questions doctrine of statutory interpretation. Congress did not, in Title IX, clearly give USDA authority to impose the school lunch mandate since it vastly changes both the rights and obligations set forth in Title IX and also the way that school programs and student athletics are operated in the country.

323.   By providing males the opportunity to access all female spaces and programs, all Defendants have violated their obligation under Title IX to provide equal treatment, benefits, and opportunities in education to girls.

324.   Defendants, through the school lunch mandate, are also unlawfully withholding agency action by refusing to enforce Title IX as applied to sex separation for school-activities and facilities.

325.   Title IX's prohibition of discrimination "on the basis of sex" does not encompass discrimination based on sexual orientation or gender identity, either as a component of the term sex, on any sex stereotyping theory, or as separate or subsidiary protected classes.

326.   *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), did not interpret Title IX, and thus it does not require the school lunch mandate.

327.   A court judgment holding that this mandate does not exist would mean that Grant Park Christian Academy does not need an exemption and thus reputationally would not be labelled as not in compliance with Title IX.

328.   **Contrary to Title IX's religious exemption.** Second, the school lunch mandate exceeds the authority of Title IX by artificially imposing procedural hurdles on obtaining a religious exemption.

329.   Under Title IX's religious exemption, Title IX does not apply *by operation of law* where it would violate the religious tenets of an organization.

330.   But USDA has a regulation that requires schools to write to USDA to "claim" an exemption, presumably to receive a government permission slip to exempt the school at some unknown point in the future from complying with identified portions of Title IX. 7 C.F.R. § 15a.205.

331.   This exemption process does not address interim compliance or retroactive liability, nor does it give USDA any duty or timeframe to respond with any assurance of exemption.

332.   The school lunch mandate requires an exemption claim (and implicitly USDA approval) and thus contradicts Title IX's religious exemption.

333.   Therefore, the agency actions must be held unlawful, set aside, and preliminarily and permanently enjoined under the APA and the Court's

inherent equitable power to enjoin ultra vires and unconstitutional actions, *Larson*, 337 U.S. at 689-91.

## CLAIM FOUR

### FREEDOM OF SPEECH AND ASSOCIATION
### (FIRST, FIFTH, AND FOURTEENTH AMENDMENTS)

334.   Plaintiff re-alleges and incorporates as though fully set forth, paragraphs 1–277 of this complaint.

335.   Under the First Amendment to the U.S. Constitution, "Congress shall make no law . . . abridging the freedom of speech . . . or the right of people to peaceably assemble . . . ." U.S. Const. amend. I.

336.   Under the Fifth Amendment to the U.S. Constitution, "No person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

337.   Under the Fourteenth Amendment, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. IV.

338.   The school lunch mandate violates this freedom of speech.

339. **Free Speech Rights.** The speech of Grant Park Christian Academy, as well as the speech of its children, teachers, and employees, is protected under the First Amendment.

340. Grant Park Christian Academy, its children, its teachers, and its employees have a right to speak freely and truthfully about the biological reality of being male and female.

341. Grant Park Christian Academy, its children, its teachers, and its employees have a right to avoid age-inappropriate subjects about marriage and human sexuality entirely.

342. Grant Park Christian Academy, its children, its teachers, and its employees have a right to speak openly and authentically about their religious beliefs on these matters in age-appropriate settings with due parental consent and involvement.

343. **Restricted and Compelled Speech.** But the school lunch mandate restricts and compels the speech about marriage, sexuality, and the human person, contrary to the constitutional rights to free speech.

344. The school lunch mandate, both facially and as-applied, restricts speech and imposes mandates on speech based on its content and viewpoint, by requiring speech affirming any self-professed gender identity or sexual orientation, and by prohibiting speech taking a different view.

345.   The school lunch mandate forces the school to post posters and adopt policies explaining an incorrect view of the law—a view of the law that violates the school's religious beliefs.

346.   The agency actions require children and teachers to speak in ways that are contrary to biological sex, including the use of pronouns, in educational activities, curricula, screening questions, record keeping, and signage.

347.   The school lunch mandate also requires the school to adopt policies governing speech that are contrary to their current expression, and it requires the school to file assurances of compliance with government officials, affirmatively pledging to avoid speech that the government disfavors.

348.   The school lunch mandate compels speech by requiring schools to post posters saying that it does not engage in discrimination on the basis of sexual orientation or gender identity.

349.   In the past, children and teachers at Grant Park Christian Academy have shared their views and concerns on these topics, in appropriate and child-sensitive ways, to their parents and families in the context of their education, but under the school lunch mandate, officials would consider this speech to constitute harassment, hostile environment, or discrimination.

350.   But for the school lunch mandate, the children and teachers at Grant Park Christian Academy would continue to speak freely on these matters in each day as they deem appropriate, without penalty.

351.   Defendants also intrude upon the right to expressive association (or freedom of assembly) of the children and teachers at Grant Park Christian Academy by requiring them to participate in facilities, programs, and other healthcare-related endeavors contrary to their scientific positions, religious beliefs, and expressive identities and to associate with messages on these topics they disagree with.

352.   **First Amendment violations.** The school lunch mandate's speech regulations are not justified by a compelling governmental interest.

353.   Defendants lack authority under Title IX to interfere in what children and schools can and cannot say about and on the debated topics of gender identity and sexual orientation.

354.   The school lunch mandate's speech regulations are not narrowly tailored to achieve any government's interest.

355.   The school lunch mandate is an overbroad restriction of speech, and it sweeps within its ambit a substantial amount of First Amendment-protected speech and expression.

356.   This overbreadth chills the speech of children and teachers who engage in private speech or religious expression through statements, notices, and other means.

357.   The school lunch mandate imposes an unconstitutional condition on schools' receipt of federal funding.

358.   Therefore, Defendants' actions promulgating and enforcing the school lunch mandate violate the freedom of speech and impose unconstitutional conditions on the receipt of federal funds.

359.   In the alternative, if Title IX is deemed to prohibit discrimination on the basis of sexual orientation or gender identity, Title IX itself and Defendants' enforcement of it violate the freedom of speech for the same reasons and impose unconstitutional conditions on the receipt of federal funds.

360.   Therefore, Defendants' enforcement and implementation of the school lunch mandate, under any claim of authority, must be enjoined and set aside under the APA, 42 U.S.C. § 1983, and the Court's inherent equitable power to enjoin ultra vires and unconstitutional actions, *Larson*, 337 U.S. at 689-91.

## CLAIM FIVE

### FREE EXERCISE OF RELIGION
### (FIRST, FIFTH, AND FOURTEENTH AMENDMENTS
### AND THE RELIGIOUS FREEDOM RESTORATION ACT)

361.   Plaintiff re-alleges and incorporates as though fully set forth, paragraphs 1–277 of this complaint.

362.   The Religious Freedom Restoration Act (RFRA) prohibits the federal government from substantially burdening a person's exercise of religion, unless the government proves that the burden is the least restrictive means of furthering a compelling government interest. 42 U.S.C. § 2000bb-1(a).

363.   Under the First Amendment to the U.S. Constitution, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I.

364.   Under the Fifth Amendment to the U.S. Constitution, "No person shall be * * * deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

365.   RFRA and the U.S. Constitution apply to Title IX and USDA implementing regulations, notices, and actions, as well as to Defendants' enforcement of the school lunch mandate is subject to RFRA.

366.   The school lunch mandate violates this free exercise of religion.

367.   **Religious Freedom Rights.** Grant Park Christian Academy holds traditional Christian beliefs about marriage, sexuality, and the human person.

368.   Grant Park Christian Academy's sincerely held religious beliefs prohibits it from complying with the school lunch mandate.

369.   Grant Park Christian Academy exercise their religious beliefs through providing education to its low-income and underprivileged community and through expressing messages during their school activities.

370.   Its religious beliefs, including its understanding of the nature of the human person and the characteristics of marriage and the family, preclude it from complying with a federal mandate to substitute gender identity for biological sex in any aspect of its activities.

371.   These religious beliefs in particular preclude the school from complying with a federal mandate to place biological males into female restrooms, private spaces, and programs, and vice versa.

372.   **Restricted and Burdened Religious Exercise.** The school lunch mandate substantially burdens Grant Park Christian Academy's exercise of religion by requiring it to violate its religious beliefs and by exerting significant pressure on it to violate its beliefs to keep participating in federally funded meal programs and activities or else face exclusion from those programs and enforcement actions by Defendants.

373.   If Grant Park Christian Academy continues to participate in meal programs, it will have to either violate the school lunch mandate or violate its religious beliefs.

374.   Grant Park Christian Academy's compliance with its beliefs and speech according to its beliefs is a religious exercise.

375.   Grant Park Christian Academy's provision of education in accord with its religious beliefs prevents no one from obtaining other forms of education from other providers.

376.   **RFRA and First Amendment violations.** The school lunch mandate furthers no compelling governmental interest and is not the least restrictive means of furthering Defendants' purported interests.

377.   Upon information and belief, the school lunch mandate specifically and primarily burdens religious conduct and it favors some religious beliefs over others.

378.   Upon information and belief, Defendants permit exceptions to and engage in non-enforcement of nondiscrimination requirements in Title IX and similar statutes for many secular and non-secular reasons, while denying faith-based providers an exception for religious reasons.

379.   Upon information and belief, Defendants' laws and policies have not been evenly enforced.

380.   The school lunch mandate is not neutral or generally applicable.

381.   The school lunch mandate fails to respect the religious autonomy of a religious educational institution, fails to respect that the Constitution requires a co-religionist exemption and a ministerial exemption as to hiring and admissions.

382.   If Title IX's religious exemption does not apply to non-denominational independent Christian schools, then the exemption treats religious organizations unequally and unfairly, in violation of religious exercise and equal protection.

383.   The school lunch mandate furthers no compelling or legitimate governmental interest and is not the least restrictive means of furthering any purported interests.

384.   By promulgating and enforcing the school lunch mandate without including the full religious exemption set forth in Title IX, Defendants have targeted religious schools and shown hostility toward them.

385.   Therefore, Defendants' actions violate RFRA and the Free Exercise Clause, violate Plaintiff's hybrid free speech and religious exercise rights under the First Amendment, and impose unconstitutional conditions on the receipt of federal funds.

386.   Therefore, Defendants' enforcement and implementation of the school lunch mandate, under any claim of authority, must be enjoined and set aside under the APA, RFRA, 42 U.S.C. § 2000bb-1(c), 42 U.S.C. § 1983, and

the Court's inherent equitable power to enjoin ultra vires and

unconstitutional actions, *Larson*, 337 U.S. at 689-91.

**CLAIM SIX**

**STRUCTURAL PRINCIPLES OF FEDERALISM
AND LACK OF ENUMERATED POWERS**

387.   Plaintiff re-alleges and incorporates as though fully set forth,

paragraphs 1–277 of this complaint.

388.   Any application or enforcement of Title IX or its regulations to

address gender identity or sexual orientation, or to impose such a mandate on

any theory in school lunch programs, exceeds Congress's Article I

enumerated powers and transgresses on the reserved powers of the State

under the federal constitution's structural principles of federalism and the

Tenth Amendment. U.S. Const. art. I, § 8, cl. 1; *id.* amend. X.

389.   **Separation of Powers.** Congress did not clearly delegate to the

Department the authority to resolve this major question or to rewrite Title

IX, and were it to have done so in this way, it would have violated the non-

delegation doctrine and the limits of its own enumerated powers. U.S. Const.

art. I, § 8, cl. 1.

390.   **Lack of Clear Notice.** The school lunch mandate unlawfully

seeks to impose obligations that Congress did not clearly impose when it

enacted Title IX. U.S. Const. amend. X.

391.   A "clear and manifest" statement is necessary for a statute to preempt "the historic police powers of the States," *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947), to abrogate state sovereign immunity, or to permit an agency to regulate a matter in "areas of traditional state responsibility," *Bond v. United States*, 134 S. Ct. 2077, 2089 (2014).

392.   The federal Constitution limits the States and the public's obligations to those requirements "unambiguously" set forth on the face of the statute, *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981), both to make a statute apply to the States and to show that the statute applies in the particular manner claimed, *Gregory v. Ashcroft*, 501 U.S. 452, 460–70 (1991).

393.   The Supreme Court thus applies this canon to protect private parties when the government "intrudes into an area that is the particular domain of state law" because Congress must " 'enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property.' " *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, No. 21A23, 2021 WL 3783142, at *3 (U.S. Aug. 26, 2021) (quoting *U.S. Forest Service v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837 (2020).

394.   The U.S. Constitution's clear-notice rule governs any interpretation of federal law in this area because the federal officials

86

displaced traditional state authority over education and educational privacy, with a possible abrogation of state sovereignty from suit, and under a statute that is enacted under the Spending Clause, to extend federal law.

395.   Defendants also subject States and religious organizations to private lawsuits for damages and attorney's fees on new theories, even though States did not know of these liabilities and could not have known or consented to this waiver of their sovereign immunity.

396.   Title IX and its regulations do not address, let alone clearly and unmistakably address, gender identity or sexual orientation, and therefore do not support any clear notice to justify the burden the school lunch mandate imposes on Grant Park Christian Academy, the public, or the States.

397.   Implementing, applying, or enforcing the school lunch mandate is not in accord with the understanding that existed among the public or the courts at the passage of Title IX, or when the States and Grant Park Christian Academy chose to begin accepting USDA funding.

398.   Grant Park Christian Academy, the States, and the public thus unconstitutionally lacked clear notice when Title IX was passed or the grants were made that the Act or its regulations would apply in this way.

399.   **Coercion and Commandeering.** Withholding all USDA or federal education funding on this theory also results in unconstitutional coercion and commandeering of the States. U.S. Const. amend. X.

400.   The school lunch mandate improperly directs state officials and coerces states into acquiescing into new spending conditions by threatening to withhold large sums of funding on which States rely.

401.   Because Defendants have violated these constitutional standards, their actions conflict with the structural principles of federalism, the Spending Clause, and the Tenth Amendment, and impose unconstitutional conditions on the receipt of federal funds.

402.   Therefore, the agency actions must be held unlawful, set aside, and preliminarily and permanently enjoined under the APA and the Court's inherent equitable power to enjoin ultra vires and unconstitutional actions, *Larson*, 337 U.S. at 689-91.

## PRAYER FOR RELIEF

For these reasons, Plaintiff Grant Park Christian Academy respectfully requests that this Court enter judgment against Defendants, and provide the following relief:

A.   That this Court declare unlawful, set aside, and vacate the agency actions as to implementation, enforcement, or application of a gender identity or sexual orientation nondiscrimination mandate in USDA school meal programs;

B.   That this Court render a declaratory judgment stating that

1.   The agency actions were issued without following the notice-and-comment and reasoned decision-making procedures required by the Administrative Procedure Act and without following the Appointments Clause;

2.   Title IX does not authorize the implementation, enforcement, or application of a gender identity or sexual orientation nondiscrimination mandate directly or indirectly;

3.   If Title IX is deemed to address gender identity or sexual orientation, Grant Park Christian Academy and similarly-situated religious organizations are and have always been exempt under Title IX by operation of statute, with no claims or assurances of exemption required from federal officials; and

4.   If Title IX or any other source of authority is deemed to prohibit discrimination on the basis of gender identity or sexual orientation on any theory, imposing or enforcing such a gender identity or sexual orientation mandate violates the constitutional principles of federalism, and violates, as to Grant Park Christian Academy and similarly-situated religious organizations, the Religious

Freedom Restoration Act and the First, Fifth, and

Fourteenth Amendments of the U.S. Constitution;

C.     That this Court issue a temporary restraining order and

preliminary and permanent injunctions against implementation,

enforcement, or application of a gender identity or sexual orientation

mandate under Title IX or under any other statutory authority, that would

cover all school operations, such as restrooms, dress codes, hiring,

admissions, curricula, activities, and daily conversations, by Defendants,

their officials, agents, employees, and all persons in active concert or

participation with them, including their successors in office, including in

school meal programs and including any actions to deny federal financial

assistance or qualification for participation in federally funded programs or

activities or by otherwise pursuing, charging, or assessing any penalties,

fines, assessments, investigations, or other enforcement actions;

D.     That this Court issue a temporary restraining order and

preliminary injunction order under 5 U.S.C. § 705 to delay the effective date

of the agency actions until at least one year after the conclusion of this

Court's review of this case;

E.     That this Court grant to Plaintiff reasonable costs and expenses

of this action, including attorneys' fees, under any applicable law, including

28 U.S.C. § 2412 and 42 U.S.C. § 1988;

90

F.     That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy so that such declarations will have the force and effect of final judgment;

G.     That this Court retain jurisdiction of this matter to enforce this Court's order;

H.     That this Court grant the requested injunctive relief without a condition of bond or other security being required of Plaintiff; and

I.     That this Court grant such other and further relief as this Court deems just and proper.

Respectfully submitted July 27, 2022.

By: /s/ Erica Steinmiller-Perdomo

HARLEY E. RIEDEL
FL Bar Number: 183628
STICHTER RIEDEL BLAIN & POSTLER P.A.
110 East Madison Street, Suite 200
Tampa, FL 33602
Telephone: (813) 229-0144
Facsimile: (813) 229-1811
hriedel@srbp.com

EDWARD O. SAVITZ
FL Bar Number: 183867
BUSH ROSS, P.A.
1801 N. Highland Avenue
Mailing: P.O. Box 3913
Tampa, Florida 33601-3913
Telephone: (813) 204-6413
Facsimile: (813) 223-9620
esavitz@bushross.com

ERICA STEINMILLER-PERDOMO *
FL Bar Number: 118439
RYAN L. BANGERT**
TX Bar Number: 24045446
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: (202) 393-8690
Facsimile: (202) 347-3622
esteinmiller@ADFlegal.org
rbangert@ADFlegal.org

JULIE MARIE BLAKE**
VA Bar Number: 97891
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
Telephone: (571) 707-4655
Facsimile: (571) 707-4790
jblake@ADFlegal.org

DAVID CORTMAN
FL Bar Number: 18433
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road NE,
   Suite D1100
Lawrenceville, Georgia 30043
Telephone: (770) 339-0774
Facsimile: (770) 339-6744
dcortman@ADFlegal.org

*Lead Counsel
**Motion for Special Admission
   forthcoming

## DECLARATION UNDER PENALTY OF PERJURY

I, Alfred Johnson, a citizen of the United States and a resident of Hillsborough County, Florida, President of the Plaintiff, declare under penalty of perjury under 28 U.S.C. § 1746 that the above is true and correct to the best of my knowledge.

Executed this 27th day of July, 2022 at Tampa, Florida.


/s/Alfred Johnson
First and Last Name


*I certify that I have the signed original of this document that is available for inspection during normal business hours by the court or a party to this action.

/s/ Erica Steinmiller-Perdomo